### SCOCOZZO, et ux v. GENERAL DEVELOPMENT CORPORATION.
No. 6267-E.

Circuit Court, Indian River County.
June 15, 1965.

Jackson & Clem, Vero Beach, for plaintiffs.

Parker D. Thomson of Paul & Sams, Miami, for defendant.

D. C. SMITH, Circuit Judge.

*Final decree:* This cause has come on for final hearing after trial before the court. Argument of counsel for the respective parties has been heard and briefs filed by them have been duly considered.

In their complaint, the plaintiffs allege that they lived in Islip, New York, and came to Florida for the sole purpose of obtaining a waterfront home and to enjoy their favorite pastime of boating. They visited various subdivisions and developments, one of which was owned and subdivided by the defendant and known as Sebastian Highlands Subdivision, located in Indian River County. On or about March 7, 1958, they entered into a contract for the purchase of a certain lot in Sebastian Highland Subdivision from the defendant. An agent of the defendant met the plaintiffs at the yacht club sales office of the subdivision, painting glowing pictures of improvements to be made and plans for development and telling them of the many benefits to be derived from living in Sebastian Highlands Subdivision. The agent was advised and was well aware of the plaintiff's intent and desire to live on a navigable waterway to pursue their boating pastime; he showed plaintiffs a lot on Collier Creek, representing that Collier Creek was to be a navigable canal and that bridges were to be built over the canal and showed plaintiffs where Collier Creek was to be extended to the Sebastian River, a river in the immediate vicinity; that the agent represented and told plaintiffs that the canal would be completed and navigable to the Sebastian River in the near future and that plaintiffs could travel from their back yard to the Sebastian River, then to the Indian River and then to the Atlantic Ocean. The agent took plaintiffs to the yacht club's sales office of the defendant and showed them on a large map where Collier Creek was to join the Sebastian River as a navigable canal and represented again that Collier Creek would be joined with the Sebastian River in the near future by the defendant. In reliance on such representation that Collier Creek would be extended and navigable to the Sebastian River, plaintiffs entered into a contract of purchase for a lot at a price above those lots not located on Collier Creek, to-wit $2,200. On or about June 12, 1959, plaintiffs returned to Sebastian Highlands Subdivision and the agent represented again that Collier Creek would be navigable to the Sebastian River and that work on the creek was progressing and would continue until completion to the Sebastian River. In reliance on said representation, plaintiffs entered into a contract to purchase a house to be built

on the lot by the defendant for a total price of $17,420, which sum has been fully paid by the plaintiffs. Plaintiffs resided patiently for an extended period of time waiting for the canal to be completed, being assured by agents for the defendant that defendant would keep working on extending Collier Creek; that plaintiffs have recently been informed by the defendant that Collier Creek will not be extended and that there was never a plan to extend Collier Creek to Sebastian River. That Collier Creek is serving the purpose solely of a drainage ditch of the surrounding area, that the water is stagnant, a breeding place for mosquitoes, creates a vile and obnoxious stench detrimental to human comfort and is wholly unsuitable for the purpose for which plaintiffs were induced to purchase property, to-wit: a home bordering on a navigable canal leading to the Sebastian River through which plaintiffs could operate their boat to the Atlantic Ocean. The plaintiffs have offered to return the house and lot for the purchase price paid by plaintiffs, which offer has been refused by the defendant. At the time the defendant, through its agent, made such representations, defendant well knew such representations were false, inasmuch as there was never a plan to connect Collier Creek to the Sebastian River and that this representation was made solely with the intent to cheat and defraud plaintiffs by inducing them to purchase the house and lot on the canal, which plaintiffs would not have done but for such false and fraudulent representations.

Plaintiffs pray for rescission of the contract and deed and for damages.

Defendants, by their answer, admit certain portions and deny certain other portions of the complaint and in addition plead a certain exclusionary provision of the contract between the parties, laches and a waiver of the alleged breach as defenses.

The court finds from the evidence that the plaintiffs first became interested in Sebastian Highlands Subdivision through seeing an ad which appeared in Life magazine. (Tr. 48 and def.'s ex. 1) On March 7, 1958, the plaintiffs stopped at the defendant's sales office in the Sebastian Highlands Yacht Club on U. S. Highway 1 and the Indian River at Sebastian, Florida. There they were shown brochures and a map which was on a wall in the yacht club, which brochures and map showed the proposed development of Sebastian Highlands Subdivision. The plaintiffs selected a certain lot and were taken out to see such lot and Collier Creek adjacent thereto. They then returned to the yacht club and made a $10 deposit on the lot (ptfs.' ex. 2), and shortly thereafter proceeded to their home at Islip, Long Island, New York. On March 11, 1958, a contract covering such lot was

prepared by defendant and mailed to the plaintiffs, together with certain brochures, at their Long Island address. (Ptfs.' ex. 1 and def.'s exs. 2 and 3)  The plaintiffs executed the contract and on April 2, 1958, returned it to the defendant, together with a check covering balance of down payment. Plaintiffs returned to the subdivision about June 12, 1959, and again saw their lot and Collier Creek as then improved and being improved through widening and bulkheading. While at Sebastian Highlands on this occasion, plaintiffs selected a home to be built on their lot and executed a contract with defendant to build it for them (ptfs.'s ex. 3) and again returned to their home in New York. On December 1, 1959, plaintiffs returned to the subdivision to live in their new home and have resided there since.

Plaintiffs testified that defendant's agent stated to them on March 7, 1958, that Collier Creek was going to connect with the Sebastian River and plaintiffs could boat from the property they purchased through Collier Creek to the Sebastian River, from the Sebastian River into the Indian River and through the inlet into the ocean. (Tr. 8 and 306)

Two of defendant's officers and defendant's land developing architect and engineer testified that the defendant never planned for Collier Creek to be made navigable to the Sebastian River. (Ptfs.' ex. 22 and 23 and tr. 331)

Mr. Robert F. Mackle testified —

"Q During the time you were there, was there any plan or was there any discussion about extending Collier Creek into the Sebastian River?

A No, sir, never at any time.

Q Or extending it any place so it would run into the — so it would become navigable to the Atlantic Ocean?

A No, sir, It is what I would call an engineering impossibility. Nothing is impossible, but from my recollection of this particular land, from a coast and geodetic survey, it would show this at 20-odd feet above sea level. Well, sea level from this property is a matter of — what is it — a mile or a mile and a half? Well, I don't think engineers have found how to make water run uphill. You just couldn't do it. It would be the kind of thing you wouldn't consider doing." (Ptfs.' ex. 22, page 10)

Mr. James E. Vensel, land developing architect and engineer, testified —

"Prior to purchase of the property, it was analyzed by me in conjunction with the Mackles, that we would not be able to

create a system of waterways within the property that would have access out to tidewater, more or less, with the exception possibly of the two 40-acre disjointed tracts that I mentioned earlier. Collier Creek being through the properties and the property being at approximately a 20 foot elevation, it was impractical either to dig a 20-foot deep waterway or to provide any other kind of access, because the natural channel of Collier Creek crosses through our property and left the property and passed through adjoining owners that probably we did not own prior to it reaching Sebastian River, where it was really tidewater." (Tr. 338 and 339)

It (Collier Creek) was planned only as a drainage facility and a limited inland waterway to run into a lake at the boundary of the defendant's property or proposed development. (Ptfs.' ex. 22, page 10 and 11, and tr. 343) The testimony shows that various inquiries were made of the defendant concerning Sebastian Highlands Subdivision and in answering those inquiries, the defendant represented —

"Our Sebastian Highlands Development is basically an inland community. However, we are developing Collier Creek, which runs through the development and will enter into a 25-acre lake, which will offer fishing, boating and swimming within the development. It will not connect with the Indian River or the Atlantic Ocean, however. For the latter type of boating and fishing recreation, we have established a yacht club on the Indian River, with adequate parking and launching facilities. This yacht club is reserved for residents of Sebastian Highlands only." (Tr. 402-414 and def.'s exs. 9, 10 and 11)

The defendant never authorized any of its sales personnel to represent that Collier Creek was to be extended into the Sebastian River in a northerly or northwesterly direction for purposes of navigation. (Tr. 366) One of the defendant's officers was asked —

"Do you have any knowledge of any of the sales personnel making representations that this creek [Collier Creek] was to extent into the Sebastian River during the 1957 to 1960 era?"

and his answer was —

"No, sir. If we did, we would stop it immediately, but there was nothing like that." (Ptfs.' ex. 22, page 9)

Sebastian Highlands Subdivision, as originally planned, lay entirely north of the Fellsmere Highway or Road. (Ptfs. ex. 12 and def.'s exs. 2 and 3) Later, property south of the Fellsmere Road was obtained and in the latter part of 1959 or 1960, was included in an enlarged plan of Sebastian Highlands Subdivision. (Ptfs. ex. 11 and def.'s exs. 6 and 7) In these enlarged plans,

Collier Creek to the south or southeast joined Collier Waterway and Collier Waterway joined Elkcam Waterway and Elkcam Waterway joined Sebastian Creek, an extension of Sebastian River. Collier Waterway and Elkcam Waterway were not navigable into the Sebastian Creek, however, as there was a dam on Elkcam Waterway some distance back from Sebastian Creek. (Tr. 303) The testimony of various witnesses with reference to Collier Creek running into the Sebastian River involves a time period when the enlarged plans were in existence and sales were being made in that portion of Sebastian Highlands Subdivision lying south of Fellsmere Road, and this fact must be kept in mind when considering such testimony.

Plaintiffs alleged in their complaint that defendant's agent showed them on a large map where Collier Creek was to join the Sebastian River as a navigable canal. The documentary evidence fails to substantiate this allegation. (Ptfs.' ex. 12 and def.'s exs. 2, 3 and 4) The evidence shows that the map (def.'s ex. 4) which was on a wall in the yacht club sales office on March 7, 1958, and seen by the plaintiffs at that time, and the brochures (def.'s exs. 2 and 3), copies of which were mailed to the plaintiffs with the proposed contract for plaintiffs to sign, did not show Collier Creek connecting with the Sebastian River, but showed Collier Creek running into a proposed lake at the boundary of defendant's property and proposed development. The plaintiffs were at the Sebastian Highlands Subdivision on March 7, 1958, prior to making the initial deposit on the lot and prior to executing the contract for the lot. They were again at the subdivision for a week around June 12, 1959, prior to contracting with the defendant for the construction of their home. (Tr. 54) It appears from the evidence as a whole that an inspection of Sebastian Highlands Subdivision and Collier Creek would have raised doubts in the mind of a reasonably prudent individual as to the likelihood of Collier Creek being made navigable into the Sebastian River.

The testimony as to whether or not the alleged misrepresentation was made is in conflict. The plaintiffs and the defendant were trading at arm's length and no fiduciary relationship existed between them. It is well settled, as a broad generalization, that a person to whom false representations have been made is not entitled to relief because of them if he might readily have ascertained the truth by ordinary care and attention, and his failure to do so was the result of his own negligence. Where the means of knowledge are at hand and are equally available to both parties, and the subject matter is equally open to their inspection, if one of them does not avail himself of those means and opportunities, he will not be heard to say that he was de-

ceived by the other's misrepresentations. See Potaker v. Hurtak, Fla. 1955, 82 So.2d 502; Camardella v. Courtright, Fla. 1936, 171 So. 225; and Davis v. Dunn, Fla. 1952, 58 So.2d 539.

The contract between the plaintiffs and the defendants contained an exclusionary provision, as follows —

"This application constitutes the entire agreement between the parties and may not be changed orally. It may be changed only by agreement in writing, signed by the parties against whom the enforcement of any waiver, change, modification or discharge is sought. No waiver of any provision of this agreement shall be construed as a continuing waiver of such provision on any subsequent occasion unless such waiver is in writing and states explicitly that it is intended to modify this agreement. The Subdivider is not liable nor bound in any manner by express or implied warranties, guarantees, promises, statements, representations, or information pertaining to said lot, made or furnished by any real estate broker, agent, employee, servant or other person representing or purporting to represent the Subdivider, except as such warranties, guarantees, promises, statements, representations or information are expressed and specifically set forth herein or in any written amendment hereto as aforesaid."

Such recital is evidence, apparent in the record, that plaintiffs did not, in fact, rely upon the alleged misrepresentations. See Fote v. Reitano, 46 So.2d 891-892. This contract itself shows that the alleged representations were not relied on, as the plaintiffs could have inserted provisions therein to protect themselves against the contingencies covered by the alleged representations, but failed to do so. See 23 Am. Jur. page 941, which cites Nounnan v. Sutter County Land Co., 81 Cal. 1, 22 Pac. 515, where the following appears —

This is an action for damages for fraudulent representations alleged to have been made by the respondent to induce the appellants to enter into a contract to construct a levee upon the lands of the former. . . . The representations relied upon as fraudulent are thus stated in the complaint: "That on the 13th day of August, 1884, at said city and county, the defendant represented to the plaintiffs that the defendant wished the plaintiffs to construct a certain levee upon the lands of the defendant in the county of Sutter. The defendant, in order to induce the plaintiffs to do the said work, represented to them that the amount of earth measured in excavation, necessary to be placed upon said levee in order to construct the same, was 350,000 cubic yards. The defendant further represented to the plaintiffs that the character of the earth along the line of said levee was light, sandy loam, and that it was good scraper material. The plaintiffs then stated to the defendant that if the quantity exceeded 350,000 cubic yards, or, if the adjacent earth varied from that stated, they would not do the said work, and proposed to go upon the ground and examine the same. Thereupon the defendant dissuaded and prevented them from doing so, and said that the plaintiffs could entirely rely on the accuracy of said statements.

The defendant stated to the plaintiffs that the defendant had made a careful survey and measurement of said work, and had fully informed itself of the character of the said material. Both and all of said representations were made with the intent to induce the plaintiffs to enter the contract hereinafter mentioned. The plaintiffs relied upon the said representations and were induced by them to abstain from examining the premises. The premises are about one hundred and fifty miles from San Francisco, and it would have required many days of examination, surveys, and measurements to have ascertained the truth or falsity of said representations." It is alleged that the plaintiffs relied, and had a right to rely, upon these representations, and that they were thereby induced to enter into the contract without investigating for themselves the matters about which the representations were made. . . . "That both of said representations were untrue. The fact was that the cubic contents of the said levee were such that it required 500,000 cubic yards, as aforesaid, to construct it. And the character of said adjacent earth was, except very near the surface, stiff *adobe,* and to a great extent hard-pan, both of which are more difficult to remove than light, sandy loam. The defendant at said time had reasonable ground to believe, and did believe, that both of said representations were not true, and to believe, and did believe, the facts to be as hereinabove set forth. . . . On the said 16th day of December the plaintiffs, by reason of the matters aforesaid, quit work under said contract, abandoned the same, and declared to the defendant that they did abandon and repudiate the same, and have ever since done so, and they demanded of defendant the reasonable value of the work done. The reasonable value of the said work was $57,120, and the plaintiffs admit that they received from defendant, in the premises, $36,350. But the same was paid before the plaintiffs discovered any of the facts regarding quantity and quality. The capital of the plaintiffs was wholly exhausted in the performance of said work. The plaintiffs have been damaged in the premises in the sum of $20,700. And therefore the plaintiffs pray judgment against the defendant in the sum of $20,700 and costs."

It will be seen that there are two representations relied upon, viz., that the amount of earth in excavation necessary to construct the levee was 350,000 cubic yards, and that the character of earth along the line of said levee was light, sandy loam and good scraper material.

\*       \*       \*

It is evident from the contract itself that the plaintiffs did not regard either of these representations as material, and that they did not rely upon them. They could have protected themselves against both of the contingencies covered by the representations by their contract. They were by the terms of the agreement to have a fixed sum per cubic yard for the work. Therefore the amount of earth necessary to be moved in order to complete the work was immaterial, except that they were required to have the same completed within a certain time or forfeit a part of their compensation. They could easily have guarded against this by providing that if the work overran the quantity named a longer time should be allowed them. As to the representation that the material was of a kind that would be easily worked, they could have protected themselves by providing that for that class of work they should have 12 cents per cubic yard, and for more difficult or expensive material to handle a greater sum. To have inserted such provisions in the contract would have been but an act of common prudence. If they had regarded these matters as material and contracted with reference to them, they would no doubt have been inserted.

Treating these as a part of the negotiations leading up to and forming the basis of the contract, we must presume that the entire negotiations of the parties were included in the written contract as executed, and, so presuming, we must hold that they were bound to move the earth contracted to be handled, and to do it within the time named, without reference to its quantity or quality. Civil Code, § 1625; Pickering v. Dowson, 4 Taunt, 779. This was their contract. Treating them as mere representations made to induce the making of the contract, the contract itself furnishes sufficient evidence of the fact that they were not relied upon, and were not regarded by the plaintiffs as material.

If navigable water from their home to the Sebastian River was of importance to the plaintiffs, prudence dictated that they require a provision thereon in the contract. The plaintiffs' failure in this respect is evidence that they did not rely upon such representation and that such representation was not regarded by them as material.

The rule is that frauds and misrepresentations, insofar as rescission is concerned, are never presumed and must be established by clear and convincing proof, 14 Fla. Jur., 642, Sec. 83; Welbourn v. Cohen (Fla. App. 1958), 104 So.2d 380; Graessle v. Schultz (Fla. 1956), 90 So.2d 37; and Biscayne Boulevard Properties, Inc., v. Graham (Fla. 1953), 65 So.2d 858. The plaintiffs have failed to sustain the burden of proof in the manner required by law in cases of this nature.

In addition to the plaintiffs' failure to sustain the burden of proof in the manner required, the court further finds from the evidence that the plaintiffs moved into their house in December, 1959. (Tr. 24) In April, 1960, Mrs. Scocozzo commenced complaining about the alleged failure of the defendant to make Collier Creek navigable to the Sebastian River in a northwesterly direction. (Tr. 424) Mr. Scocozzo testified that some time during 1961 he made a personal investigation of the lay of the land and found that to so extend Collier Creek would be impossible. (Tr. 323 and 324) He further testified that about the same time he heard that the General Development Corporation had never intended to make Collier Creek navigable to the Sebastian River. (Tr. 325) On January 23, 1962, Mrs. Scocozzo wrote to General Development Corporation, asking that defendant rescind the transaction, stating as a fact that Collier Creek not now and will not ever connect with the Indian River via the Sebastian River. (Ptfs.' ex. 5) The letter also asserted that the plaintiffs have had "two years of aggravation because of a thoroughly unsatisfactory heating system — your records will show the amount of money you have spent trying to remedy this situation. But today we are still dissatisfied and do not feel that we can go along with any more attempts to improve the system." (Ptfs.' ex. 5) On January 31,

1962, defendant replied to the plaintiffs, stating that the company never planned to make Collier Creek a navigable waterway to the Sebastian River and refusing to rescind the transaction through repurchase of the property. (Ptfs.' ex. 6) In June, 1962, plaintiffs again stated to defendant's representative that they were unhappy with their house because Collier Creek was not navigable to the Sebastian River and because of the heater. Defendant's representative told plaintiffs that defendant would install an entirely new heater if plaintiffs would be happy with the situation. Later the plaintiffs advised the defendant to install another heater. (Tr. 322 and 431) Defendant then expended $1,200 in installing a completely new heating system. (Def.'s ex. 18; tr. 431-434)

Rescission and cancellation are harsh remedies and therefore not favored by the courts. Courts of equity will not grant the remedy unless it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed. Because of this view, slight circumstances indicating a purpose or intent of the claimant to waive the right will bar relief. See Rood Company v. Board of Public Instruction (Fla. 1958), 102 So.2d 139-142. One of the most familiar applications of the rule relating to the acceptance of benefits arises in the case of contracts. It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the validity and effect of a contract; and, where one has an election to ratify or disaffirm a conveyance, he can either claim under or against it, but he cannot do both, and having adopted one course with knowledge of the facts, he cannot afterwards pursue the other. See Hendricks v. Stark (Fla. 1930), 126 So. 293-297. The plaintiffs, through accepting benefits (a new heater) under the contract, with knowledge of the facts, have waived their right, if any they ever had, to rescind the contract and deed and are now estopped from seeking such relief.

The plaintiffs having failed to sustain the burden of proof in the manner required by law in cases of this nature, and through accepting benefits, having waived their right to rescind, the complaint must be dismissed.

All reserved rulings have been made and noted on the margin of the transcript.

Upon consideration, it is ordered, adjudged and decreed —
(1)   That the complaint be and the same is hereby dismissed.
(2)   That the plaintiffs and the defendant shall bear the costs incurred by them herein.